Jon G. Shadinger Jr., Esq. (036232017)
Shadinger Law, LLC
2220 N. East Avenue
Vineland, NJ 08360
(609) 319-5399
js@shadingerlaw.com
*Attorney for Plaintiff, Dennis Maurer*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
TRENTON VICINAGE**

| | |
|---|---|
| DENNIS MAURER, an Individual,<br><br>Plaintiff,<br><br>vs.<br><br>TIRUMALA LLC, a New Jersey Limited Liability Company,<br><br>Defendant. | Case No. 3:26-cv-14081<br><br>**COMPLAINT** |

## Introduction

Plaintiff, DENNIS MAURER, an individual ("Plaintiff"), on his own behalf and on the behalf of all other similarly situated mobility impaired persons hereby sues the Defendant, TIRUMALA LLC, a New Jersey Limited Liability Company ("Defendant"), for injunctive relief, damages, attorney's fees, litigation expenses, and costs pursuant to Title III of the Americans with Disabilities Act, 42 U.S.C. § 12181 *et seq.* ("ADA") and the New Jersey Law Against Discrimination, N.J.S.A. 10:5-1 *et seq.* ("LAD").

## The Parties

1. Plaintiff, DENNIS MAURER, is an individual over eighteen years of age and is otherwise *sui juris*. Mr. Maurer resides at 8 Prospect Avenue, Egg Harbor Township, NJ 08234.

2. Defendant, TIRUMALA LLC, owns and/or operates a place of public accommodation alleged by the Plaintiff to be operating in violation of Title III of the ADA and the LAD. Defendant's main business address, as reported to the New Jersey Division of Revenue, is 955 Hooper Avenue, Toms River, NJ 08753.

**Jurisdiction and Venue**

3. Defendant's property/place of public accommodation – a hotel known as Howard Johnson by Wyndham Toms River, which includes an on-site restaurant and tavern known as The Grove Restaurant & Tavern – is located at 955 Hooper Avenue, Toms River, NJ 08753 (also known as Block 645, Lot 9 on the municipal tax map of the Township of Toms River, Ocean County) (the "Property", the "Hotel", or "Howard Johnson").

4. Venue is properly located in the District of New Jersey because venue lies in the judicial district of the property situs. The Property is located in and does business within this judicial district.

5. Pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343, this Court has been given original jurisdiction over actions which arise from the Defendant's violations of Title III of the Americans with Disabilities Act, 42 U.S.C. § 12181 *et seq.*[1]

6. Jurisdiction over the state law claim vests with this Court pursuant to 28 U.S.C. § 1367.

7. The Defendant owns, leases, leases to, and/or operates a place of public accommodation as defined by the ADA and the regulations implementing the ADA. The Defendant is thus required to comply with the obligations of the ADA.[2]

---

[1] *See also* 28 U.S.C. §§ 2201 and 2202.
[2] 28 C.F.R. §§ 36.201(a) and 36.104.

8. Plaintiff is an individual with disabilities as defined by and pursuant to the ADA. Mr. Maurer has multiple sclerosis and therefore has a physical impairment that substantially limits many of his major life activities[3] including, but not limited to, not being able to walk, stand, reach, or lift. Mr. Maurer, at all times, requires the use of a wheelchair to ambulate.

**Factual Background**

9. Mr. Maurer is a staunch advocate of the ADA. Since becoming mobility impaired (and having to fully rely on the use of his wheelchair to ambulate) he has dedicated his life to the elimination of accessibility discrimination so that he, and others like him, may have full and equal enjoyment of all public accommodations without fear of discrimination and repeated exposure to architectural barriers.

10. Mr. Maurer is the President of an advocacy group, known as The Independence Project, whose goal is to foster a community of disabled people, educate them as to their rights, and ensure their accessibility to places of public accommodation across the country.

11. Mr. Maurer continues to encounter architectural barriers at many of the places that he visits. Seemingly trivial architectural features such as parking spaces, curb ramps, and door handles are taken for granted by the non-disabled but, when improperly designed or implemented, can be arduous and even dangerous to those in wheelchairs – the same holds true for the Property which forms the basis of this action.

12. The barriers to access that Mr. Maurer experiences at differing places of public accommodation are often similar in nature. For example, he is repeatedly faced with sloping in parking lots, improper curb ramps, abrupt changes of level within paths of travel, and non-accessible restrooms (even when designated "accessible" or "handicapped"). This holds true for

[3] As defined by 28 C.F.R. § 36.105(b)(1)–(2).

hotel rooms as well; he is often faced with a lack of maneuverability within the room and a lack of accessible features within the restrooms. He has become frustrated and disheartened by the repetitiveness of the complaints he has been forced to make to the employees and management at various establishments in the past; most often to no avail. Thus, he now finds his redress through the ADA; as Congress intended.

13. As part of his duties within The Independence Project, Mr. Maurer inspects properties that were previously in violation of the ADA and subject to litigation by the advocacy group and/or its members. Such properties are inspected by Mr. Maurer, or other members (based on scheduling and geography), in order to determine if such have been made accessible and continue to remain in compliance; it is his normal practice to inspect the properties under his purview at least twice per year. Additionally, Mr. Maurer inspects additional properties that he visits as a patron, or when they are incident to his inspection routes, and/or when they are along his usual travel routes.

14. The Property itself was previously subject to litigation by The Independence Project for non-compliance with the ADA[4] and is therefore among the properties subject to reinspection by Mr. Maurer. Further, the properties in close proximity to the Property which have previously been subject to litigation by The Independence Project and/or its members for non-compliance with the ADA, and are now subject to reinspection by Mr. Maurer, include the following:

a. 132 Route 37 East, Toms River, NJ 08753; *The Independence Project, Inc. v. White Castle System, Inc.*, No. 2:13-cv-01654 (D.N.J. filed Mar. 18, 2013)

b. 213 Route 37 East, Toms River, NJ 08753 (Toms River Town Center); *The Independence Project, Inc. v. DHG*, No. 2:19-cv-06503 (D.N.J. filed Feb. 21, 2019)

---

[4] *See The Independence Project, Inc. v. Parsko, Inc.*, No. 3:18-cv-00683 (D.N.J. filed Jan. 17, 2018).

c. 290 Route 37 East, Toms River, NJ 08753 (Days Hotel Toms River); *The Independence Project, Inc. v. CT TR Holdings LLC*, No. 3:19-cv-06573 (D.N.J. filed Feb. 22, 2019)

d. 635 Bay Avenue, Toms River, NJ 08753 (Seacourt Pavilion); *The Independence Project, Inc. v. SP Acquisition Associates, LLC*, No. 3:13-cv-02509 (D.N.J. filed Apr. 18, 2013)

e. 984 Route 166, Toms River, NJ 08753; *The Independence Project, Inc. v. Route 166, LLC*, No. 3:18-cv-04802 (D.N.J. filed Mar. 29, 2018)

15. Mr. Maurer has stayed at the Property as a guest; his most recent stay occurred on or about August 25, 2026, when he stayed overnight in the Hotel's designated mobility accessible guestroom. On this, and past occasions, Mr. Maurer has visited the Property as a bona fide patron with the intent to avail himself of the goods and services offered to the public within – including its guestrooms, restaurant and tavern, indoor pool, and business center – but found that the Property was rife with violations of the ADA – both in architecture and in policy. On his most recent stay, unable to make use of the designated accessible parking, Mr. Maurer was forced to park his van in a standard parking space and unload into an adjoining designated accessible space; he then found the pool lift out of order and strapped in place, leaving him unable to use the Hotel's pool.

16. Prior to his stay, Mr. Maurer used the Hotel's website to ascertain the accessibility of the Property – including the accessible features of its guestrooms and common areas. The website lists numerous accessible features of the Property – including an "Accessible Pool," an "Accessible Business Center," "Accessible Car Self-Park," "Accessible Van Self-Park," an "Accessible Route to Pool," and "Venues Serving Food and Drink are Wheelchair Accessible" – and describes its mobility accessible guestroom as having a "bedroom [that] is wheelchair

accessible" and "closet rods at wheelchair height." Upon his stay, Mr. Maurer found these representations to be inaccurate; as detailed below, the pool lift was inoperable, the business center, restaurant, tavern, and pool area provide no accessible tables or work surfaces, the accessible parking is deficient, and the guestroom lacked the clear floor space and accessible storage he requires.

17. Mr. Maurer and his family frequently vacation at the Jersey Shore. In doing so, Mr. Maurer has stayed at the Property and at several other hotels in the area,[5] and he plans to continue to do so in the future when his family is vacationing at the Jersey Shore, including near Long Beach Island and Seaside Heights. The Property is located just off Route 37 – the principal route between the Garden State Parkway and the barrier island.

18. Further, Mr. Maurer travels to the area approximately once per month to visit Eastern Dental in nearby Manahawkin[6] for his son's ongoing orthodontia treatments. Moreover, each member of Mr. Maurer's family uses Eastern Dental as their general dental practitioner for regular cleanings and other dental work.

19. Prior to the onset of his disease and his ensuing disability, Mr. Maurer was a licensed thoroughbred horse trainer and assistant horse trainer for over twenty-five years. Horseracing remains his passion; he attends workouts, trainings, sales, and live racing whenever possible – as such he regularly travels across New Jersey, Pennsylvania, Delaware, and New York. The horse racing venues/farms frequently traveled to by Mr. Maurer include, but are not limited to, the following:

---

[5]Including Sunset Motel, 56 Webster Avenue, Seaside Heights, NJ 08751; and Cloud 9 Inn, 124 Hamilton Avenue, Seaside Heights, NJ 08751.

[6]Eastern Dental, Manahawkin Village Shopping Center, 715 Route 72 West, Manahawkin, NJ 08050.

a. Delaware Park Race Track, located at 777 Delaware Park Blvd, Wilmington, DE 19804

b. Harrah's Philadelphia Racetrack, located at 777 Harrah's Blvd, Chester, PA 19013

c. Parx Racing, located at 2999 Street Rd, Bensalem, PA 19020

d. Penn National Race Course, located at 777 Hollywood Blvd, Grantville, PA 17028

e. Monmouth Park, located at 175 Oceanport Ave, Oceanport, NJ 07757

f. Meadowlands Racetrack, located at 1 Racetrack Dr, East Rutherford, NJ 07073

g. Saratoga Race Course, located at 267 Union Ave, Saratoga Springs, NY 12866

20. On occasion, when attending live racing at Monmouth Park, Mr. Maurer stays overnight at the Property and at other hotels in the area.

21. In sum, the Property is (1) a hotel at which Mr. Maurer has stayed as a guest and will continue to stay when vacationing at the Jersey Shore with his family, (2) itself a property subject to reinspection by Mr. Maurer following prior litigation, (3) near several other properties inspected by Mr. Maurer for ADA compliance, (4) in the area to which he travels approximately once per month for his family's dental care in Manahawkin, and (5) among the hotels at which he stays overnight when attending live racing at Monmouth Park.

22. Mr. Maurer will return to the Property in the future as a guest when vacationing at the Jersey Shore with his family, when traveling to the area for his family's dental appointments in Manahawkin, when staying overnight in the area while attending live racing at Monmouth Park, and when performing inspections at the Property and the properties in the vicinity. Mr. Maurer shall make these visits not only as a patron but also to monitor any progress made with respect to ADA compliance – he hopes his return visits are not further deterred nor made in vain.

23. Mr. Maurer has physically visited the Property and personally encountered exposure to architectural barriers and otherwise harmful conditions that have caused him embarrassment and frustration and endangered his safety during his visits to the Property.

24. The ADA has been law for over thirty (30) years and yet the Property remains non-compliant. Thus, Mr. Maurer has actual notice and reasonable grounds to believe that he will continue to be subjected to discrimination by the Defendant. This notion is further cemented by the Property's continued non-compliance after previous litigation.[7]

25. Mr. Maurer has a realistic, credible, existing, and continuing threat of discrimination from the Defendant's non-compliance with the ADA with respect to the Property as described, but not necessarily limited to the barriers he has personally encountered or observed – which are listed in Paragraph 33 of this complaint.

26. Following any resolution of this matter Plaintiff will ensure that the Defendant undertakes the remedial work that is required to cure existing violations, under the appropriate standard, and in full compliance with the ADA.

**<u>COUNT I</u>**
**Violation of Title III of the**
**Americans with Disabilities Act, 42 U.S.C. § 12181, *et seq.***

27. Plaintiff realleges and incorporates by reference all of the allegations contained in all of the preceding paragraphs.

28. Enacted by overwhelming bipartisan consensus in 1990, and reinforced with the same consensus in 2008, the ADA reflects Congress's recognition that "discrimination" has

---

[7] *See The Independence Project, Inc. v. Parsko, Inc.*, No. 3:18-cv-00683 (D.N.J. filed Jan. 17, 2018).

precluded "many people with physical or mental disabilities" from "fully participat[ing] in all aspects of society."[8]

29. Congress's objective was "the elimination or reduction of physical and social structures" that thwart "equal-citizenship stature for persons with disabilities."[9]

30. Title III of the ADA provides a cause of action to "any person" with disabilities who personally encounters an unlawful accessibility barrier and is thus "subjected to discrimination on the basis of disability."[10]

31. The Defendant has discriminated against the Plaintiff, and other similarly situated mobility impaired persons, by denying access to, and full and equal enjoyment of, the goods, services, facilities, privileges, advantages and/or accommodations of the Property, as prohibited by the ADA.

32. A preliminary inspection of the Property has shown that violations of the ADA exist. That inspection, performed by Plaintiff's expert, further revealed that the remediation of all violations/barriers listed in Paragraph 33 is both technically feasible and readily achievable. Plaintiff's expert has based this judgment on personal knowledge of materials, pricing, labor, and the completion of similar projects in the area. The remaining barriers to access – which are procedural in nature and/or policy based – will need to be monitored into the future to ensure that the current discrimination is ceased and never reinstituted.

33. The following are architectural barriers and violations of the ADA that Mr. Maurer has either personally encountered or observed during his visits to the Property, including barriers that precluded him from accessing certain areas and features of the Property:

---

[8] 42 U.S.C. § 12101(a)(1).
[9] *Tennessee v. Lane*, 541 U.S. 509, 536 (2004) (Ginsburg, J., concurring).
[10] 42 U.S.C. § 12188(a)(1).

**<u>Parking and Exterior Accessible Route</u>**

a. The Property fails to provide the requisite number of fully compliant accessible parking spaces and van-accessible parking spaces, and not all of the designated accessible parking spaces are served by an adjacent access aisle; violations of the ADAAG and Sections 208, 502, 502.2, and 502.3 of the 2010 ADA Standards, which require the number of accessible spaces set by Table 208.2 based on the total number of parking spaces provided, with at least one of every six accessible spaces being van accessible, located on the shortest accessible route to an accessible entrance, and require each accessible parking space to be served by an access aisle at least 60 inches wide (96 inches where serving a 96-inch-wide van space) that extends the full length of the space it serves, is marked so as to discourage parking in it, and adjoins an accessible route. Mr. Maurer's van utilizes a fold-out ramp which requires an access aisle in order to fully extend; due to the lack of compliant accessible parking he was forced to park his van in a standard parking space and unload into an adjoining designated accessible space – adding the fear of becoming blocked out from his van (or trapped inside) by another vehicle.

b. The designated accessible parking spaces at the Property lack proper identification signage, as vertical signs are missing at the designated spaces; a violation of the ADAAG and Sections 216.5 and 502.6 of the 2010 ADA Standards, which require each accessible parking space to be identified by a sign showing the International Symbol of Accessibility mounted with its bottom at least 60 inches above the ground, with van-accessible spaces designated "van accessible." The lack of

signage invites non-disabled patrons to park in the designated spaces, leaving Mr. Maurer without a space from which he can safely deploy his ramp.

c. The curb ramp serving the designated accessible parking contains running slopes and cross slopes steeper than allowed, and there is an abrupt change in level where the access aisle meets the sidewalk; violations of the ADAAG and Sections 303, 406, and 502.3 of the 2010 ADA Standards, which require access aisles to adjoin an accessible route, vertical changes in level no greater than ¼ inch (with changes between ¼ inch and ½ inch beveled no steeper than 1:2 and changes greater than ½ inch ramped), and curb ramps to have a running slope no steeper than 1:12 (8.33%), a cross slope no steeper than 1:48 (2.08%), flared sides no steeper than 1:10, and a level landing at least 36 inches long at the top of the ramp. When traveling from the parking area to the entrance Mr. Maurer has been impeded by the improper curb ramp and the abrupt change in level, which have presented him with a tipping hazard and could cause damage to his wheelchair.

d. The exterior accessible route leading from the parking area to the Hotel entrance contains running slopes and cross slopes steeper than allowed; a violation of the ADAAG and Sections 302 and 402 of the 2010 ADA Standards, which require floor and ground surfaces to be stable, firm, and slip resistant, and require accessible routes to have a running slope no steeper than 1:20 (5%), a cross slope no steeper than 1:48 (2.08%), a clear width of at least 36 inches, and no vertical changes in level greater than ¼ inch (with changes between ¼ inch and ½ inch beveled no steeper than 1:2). These conditions have presented Mr. Maurer with a tipping hazard which could cause injury from a fall and damage to his wheelchair.

e. The Property fails to provide a continuous accessible route throughout the entirety of the Property; the routes connecting the parking areas, building entrances, guestroom wings, and amenities are impeded by abrupt changes in level, cross slopes steeper than allowed, and steps and stairs with no accessible alternative; violations of the ADAAG and Sections 206.2.2, 206.2.4, 303, and 402 of the 2010 ADA Standards, which require at least one accessible route connecting all accessible buildings, facilities, elements, and spaces on the same site and within each building, with no steps along the route, and require accessible routes to have a running slope no steeper than 1:20 (5%), a cross slope no steeper than 1:48 (2.08%), a clear width of at least 36 inches, and no vertical changes in level greater than ¼ inch (with changes between ¼ inch and ½ inch beveled no steeper than 1:2). These architectural barriers have prevented Mr. Maurer from traveling across the entirety of the Property in his wheelchair.

f. The covered drop-off at the Hotel's main entrance canopy functions as a passenger loading zone, but the Property fails to provide an accessible passenger loading zone, as no vehicle pull-up space with an adjoining marked access aisle is provided; a violation of the ADAAG and Sections 209.2.1 and 503 of the 2010 ADA Standards, which require at least one accessible passenger loading zone in every continuous 100 linear feet of loading zone space provided, with a vehicle pull-up space at least 96 inches wide and 20 feet long, an adjoining access aisle at least 60 inches wide extending the full length of the pull-up space and marked so as to discourage parking in it, the access aisle at the same level as the vehicle pull-up space and adjoining an accessible route, no slopes steeper than 1:48 (2.08%) in any direction,

and a vertical clearance of at least 114 inches. Without an accessible loading zone Mr. Maurer cannot safely deploy his van's ramp at the entrance when arriving at the Hotel and unloading his luggage.

g. The Property fails to provide an accessible route connecting the Hotel lobby and guest areas to the restaurant and tavern located within the Hotel (The Grove Restaurant & Tavern); a violation of the ADAAG and Sections 206.2.4 and 402 of the 2010 ADA Standards, which require at least one accessible route connecting accessible building or facility entrances with all accessible spaces and elements within the building or facility, and require accessible routes to have a running slope no steeper than 1:20 (5%), a cross slope no steeper than 1:48 (2.08%), a clear width of at least 36 inches, and no vertical changes in level greater than ¼ inch (with changes between ¼ inch and ½ inch beveled no steeper than 1:2). Due to the lack of an accessible route Mr. Maurer cannot freely travel from the guest areas of the Hotel to its restaurant and tavern.

**Access to Goods and Services**

h. The check-in and registration counter at the Hotel's front desk is mounted beyond the prescribed reach ranges; a violation of the ADAAG and Sections 227.3, 308, and 904.4 of the 2010 ADA Standards, which require operable parts to be mounted between 15 and 48 inches above the floor, and sales and service counters, including check-in counters, to provide a portion at least 36 inches long and no higher than 36 inches above the floor, with a clear floor space positioned for a parallel or forward approach. Due to the height of the counter Mr. Maurer cannot make use of

it to check in, sign his registration, and conduct his transactions in the same manner as non-disabled guests.

i. The restaurant and tavern within the Hotel fail to provide the requisite number of accessible dining tables, as seating consists of high-top tables and bar stools; a violation of the ADAAG and Sections 226 and 902 of the 2010 ADA Standards, which require at least 5 percent of the seating spaces and standing spaces at dining surfaces to be accessible and dispersed throughout the space, with dining surfaces 28 to 34 inches above the floor, knee clearance at least 27 inches high, 30 inches wide, and 11 to 25 inches deep, toe clearance at least 9 inches high, and a 30-inch by 48-inch clear floor space positioned for a forward approach. The lack of tables which allow for a forward approach prevents Mr. Maurer from fully approaching a table with his wheelchair, getting his knees underneath, and dining in a comfortable manner.

j. The bar within the tavern provides no lowered portion for patrons using wheelchairs; a violation of the ADAAG and Sections 226.1 and 902 of the 2010 ADA Standards, which require at least 5 percent of the seating spaces and standing spaces at dining surfaces, including bars, to be accessible, with dining surfaces 28 to 34 inches above the floor, knee clearance at least 27 inches high and 30 inches wide, and a 30-inch by 48-inch clear floor space positioned for a forward approach. Due to the height of the bar Mr. Maurer cannot be served at, nor sit at, the bar alongside other patrons.

k. Although the Hotel advertises an "Accessible Pool," the swimming pool fails to provide an accessible means of entry – the pool lift was out of order, strapped in

place, and in disrepair; violations of the ADAAG and Sections 242.2 and 1009.2 of the 2010 ADA Standards and 28 C.F.R. § 36.211, which requires a public accommodation to maintain its accessible features in operable working condition. Sections 242.2 and 1009.2 require swimming pools to provide at least one accessible means of entry (two where the pool has more than 300 linear feet of pool wall), which must be a pool lift complying with Section 1009.2 or a sloped entry complying with Section 1009.3, with a pool lift capable of unassisted operation from both the deck and water levels and having a seat at least 16 inches wide, footrests, and a clear deck space beside the seat. Due to the inoperable lift Mr. Maurer could not enter the pool.

l. The route around the swimming pool is too narrow – the pool deck lacks the required clear width, which is further reduced by lounge chairs and other pool furniture placed along the path of travel; violations of the ADAAG and Sections 206.2.2, 402, and 403.5.1 of the 2010 ADA Standards and 28 C.F.R. § 36.211, which requires a public accommodation to maintain its accessible features in operable working condition. Sections 206.2.2, 402, and 403.5.1 require at least one accessible route to connect accessible elements and spaces on the site, including the pool and its means of entry, with a clear width of at least 36 inches, reduced to no less than 32 inches only for a length of 24 inches maximum. Due to the lack of clear width Mr. Maurer cannot freely travel around the pool deck in his wheelchair.

m. The Hotel fails to provide any accessible tables in the pool area; a violation of the ADAAG and Sections 226.1 and 902 of the 2010 ADA Standards, which require at least 5 percent of the seating spaces and standing spaces at dining surfaces to be

accessible and dispersed throughout the space, with dining surfaces 28 to 34 inches above the floor, knee clearance at least 27 inches high, 30 inches wide, and 11 to 25 inches deep, toe clearance at least 9 inches high, and a 30-inch by 48-inch clear floor space positioned for a forward approach. Due to the lack of accessible tables Mr. Maurer cannot pull up to and make use of the tables in the pool area.

n. Although the Hotel advertises an "Accessible Business Center," the desks and other work stations in the business center lack the required knee and toe clearance; a violation of the ADAAG and Sections 226.1, 306, and 902 of the 2010 ADA Standards, which require at least 5 percent of work surfaces provided for use by other than employees to be accessible, with work surfaces 28 to 34 inches above the floor, knee clearance at least 27 inches high, 30 inches wide, and 11 to 25 inches deep, toe clearance at least 9 inches high and 17 to 25 inches deep, and a 30-inch by 48-inch clear floor space positioned for a forward approach. Due to these barriers Mr. Maurer cannot pull up to and make use of the work stations.

**<u>Guestrooms</u>**

o. Mr. Maurer requires a mobility accessible guestroom with a roll-in shower. Based on the total number of guestrooms at the Hotel (upon information and belief, 96), Section 224.2 of the 2010 ADA Standards requires five (5) mobility accessible guestrooms, one (1) of which must contain a roll-in shower, and Section 224.5 requires the mobility accessible guestrooms to be dispersed among the various classes of guestrooms, providing choices of types of guestrooms, number of beds, and other amenities comparable to the choices provided to other guests. Upon information and belief, the Hotel offers mobility accessible guestrooms in only a

single room type – a room with two double beds – while offering its other guests rooms with a king bed, two queen beds, and studio and jetted-tub suites, and does not identify any guestroom as containing a roll-in shower; a violation of the ADAAG and Sections 224.2, 224.5, and 806.2 of the 2010 ADA Standards.

p. Section 224.4 of the 2010 ADA Standards separately requires nine (9) guestrooms with communication features at the Hotel. Guestrooms with communication features are scoped and counted separately from mobility accessible guestrooms; they do not provide the features Mr. Maurer requires and may not be relied upon to satisfy the minimum number of mobility accessible guestrooms required by Section 224.2. The Hotel's failure to provide the requisite number of mobility accessible guestrooms is not cured by the presence of any guestrooms with communication features.[11]

q. The designated accessible guestroom (two double beds) lacks the required maneuvering clearance between the beds; a violation of the ADAAG and Section 806.2.3 of the 2010 ADA Standards, which requires at least one sleeping area to provide a clear floor space at least 30 inches by 48 inches positioned for a parallel approach on both sides of a bed or, where two beds are provided, between the two beds. Due to the lack of clear floor space Mr. Maurer could not position his wheelchair alongside the bed in order to transfer.

r. The heating and cooling unit controls in the designated accessible guestroom are not accessible; a violation of the ADAAG and Sections 205, 308, 309, and 806.2 of the 2010 ADA Standards, which require operable parts, including controls, to be

[11] *See* 2010 ADA Standards §§ 224.2, 224.4, 224.5.

located within a clear floor space of at least 30 inches by 48 inches, mounted no higher than 48 inches and no lower than 15 inches above the floor for an unobstructed reach, and operable with one hand without tight grasping, pinching, or twisting of the wrist and with no more than 5 pounds of force. Due to these barriers Mr. Maurer could not independently adjust the temperature of his room.

s. The window curtain rod and controls in the designated accessible guestroom are mounted beyond the prescribed reach ranges; a violation of the ADAAG and Sections 308, 309, and 806.2 of the 2010 ADA Standards, which require operable parts, including controls, to be located within a clear floor space of at least 30 inches by 48 inches, mounted no higher than 48 inches and no lower than 15 inches above the floor for an unobstructed reach, and operable with one hand without tight grasping, pinching, or twisting of the wrist and with no more than 5 pounds of force. Due to their height Mr. Maurer could not open or close the curtains.

t. The lamps in the designated accessible guestroom are standard lamps whose controls are not within reach and are not operable without tight grasping, pinching, or twisting of the wrist; a violation of the ADAAG and Sections 308, 309, and 806.2 of the 2010 ADA Standards, which require operable parts, including controls, to be located within a clear floor space of at least 30 inches by 48 inches, mounted no higher than 48 inches and no lower than 15 inches above the floor for an unobstructed reach, and operable with one hand without tight grasping, pinching, or twisting of the wrist and with no more than 5 pounds of force. Due to these barriers Mr. Maurer could not independently operate the lighting in his room.

u. The closet rack in the designated accessible guestroom obstructs the latch-side maneuvering clearance needed to open the entry door and exit the room; a violation of the ADAAG and Sections 206.5.2 and 404.2.4 of the 2010 ADA Standards, which require maneuvering clearances at doors on an accessible route, including a clear space at least 60 inches deep with at least 18 inches beyond the latch side of the door on the pull side for a front approach, and require at least one door serving each accessible room or space to comply with Section 404. Due to this obstruction Mr. Maurer could not freely open the door to exit his room – a barrier which also endangers his safety in the event of an emergency.

v. The iron in the designated accessible guestroom is mounted above the closet rack, beyond the prescribed reach ranges; a violation of the ADAAG and Sections 225.2, 308, and 811 of the 2010 ADA Standards, which require that, where storage is provided in accessible spaces, at least one of each type be located within the reach ranges of Section 308 – no higher than 48 inches and no lower than 15 inches above the floor for an unobstructed reach – with a clear floor space at least 30 inches by 48 inches and with operable parts operable with one hand without tight grasping, pinching, or twisting of the wrist. Due to its height Mr. Maurer could not retrieve the iron.

w. The roll-in shower in the designated accessible guestroom lacks a wall-mounted folding shower seat – only a loose, portable shower chair is provided; a violation of the ADAAG and Sections 608.4, 610.3, and 806.2.4 of the 2010 ADA Standards, which require a folding seat to be provided in roll-in showers in transient lodging guestrooms with mobility features, with the seat L-shaped or rectangular, mounted

17 to 19 inches above the bathroom floor, and extending along the side wall to within 3 inches of the shower entry. Without a properly mounted seat Mr. Maurer cannot safely transfer from his wheelchair and shower.

x. The shower controls and hand-held shower in the designated accessible guestroom are mounted improperly and beyond the prescribed reach ranges; a violation of the ADAAG and Sections 308, 309, 608.5, and 608.6 of the 2010 ADA Standards, which require shower controls in roll-in showers to be located on the back wall or on a side wall adjacent to the seat, above the grab bar but no higher than 48 inches above the shower floor, and operable with one hand without tight grasping, pinching, or twisting of the wrist, and a hand-held shower spray unit with a hose at least 59 inches long that can be used both as a fixed-position shower head and as a hand-held shower. Due to these barriers Mr. Maurer could not independently operate the shower.

y. The water closet in the designated accessible guestroom has an improper centerline; a violation of the ADAAG and Sections 604.2 and 806.2.4 of the 2010 ADA Standards, which require the centerline of the water closet to be 16 to 18 inches from the side wall or partition, with the water closet positioned with a wall or partition to the rear and to one side. Due to the improper centerline Mr. Maurer cannot safely make use of the grab bars to transfer to and from the toilet.

**Restrooms**

z. The restrooms at the pool area contain no accessible water closet or wheelchair accessible toilet compartment; a violation of the ADAAG and Sections 213.3.1, 603, 604, and 604.8 of the 2010 ADA Standards, which require at least one toilet

compartment in each multi-user restroom to be wheelchair accessible, at least 60 inches wide and 56 inches deep (59 inches for floor-mounted water closets), with a water closet centerline 16 to 18 inches from the side wall, grab bars on the side and rear walls, and a door that does not swing into the minimum required compartment area, and require a turning space within the room. Due to these barriers Mr. Maurer cannot use the restrooms serving the pool.

aa. The restrooms at the pool area provide no accessible lavatory and, although two urinals are provided, neither is lowered; a violation of the ADAAG and Sections 213.3.3, 213.3.4, 605, and 606 of the 2010 ADA Standards, which require that, where more than one urinal is provided, at least one urinal be a stall type or wall hung type with the rim no higher than 17 inches above the floor and a clear floor space positioned for a forward approach, and at least one lavatory with the front of the rim or counter no higher than 34 inches above the floor, knee clearance at least 27 inches high and toe clearance at least 9 inches high beneath it, and exposed pipes insulated or configured to protect against contact. Due to these barriers Mr. Maurer cannot use the urinal nor fully approach the sinks to wash his hands.

bb. The dispensers in the restrooms at the pool area are mounted beyond the prescribed reach ranges; a violation of the ADAAG and Sections 308, 604.7, and 609.3 of the 2010 ADA Standards, which require dispensers and other operable parts to be mounted between 15 and 48 inches above the floor (no higher than 44 inches where the reach is over a counter 20 to 25 inches deep); Section 604.7 further requires the toilet paper dispenser to be located 7 to 9 inches in front of the water closet (measured to the centerline of the dispenser) with its outlet 15 to 48 inches above

the floor, and Section 609.3 requires at least 12 inches of clear space above a grab bar. Mr. Maurer is unable to make use of these dispensers due to their improper location.

cc. The lobby restroom lacks the required wheelchair maneuvering space; a violation of the ADAAG and Sections 603.2.1 and 603.2.3 of the 2010 ADA Standards, which require a turning space (a 60-inch diameter circle or a T-shaped space) within the restroom, and doors that do not swing into the clear floor space of any fixture. Due to the lack of maneuvering space Mr. Maurer cannot freely enter, turn around within, and exit the restroom.

dd. The water closet in the lobby restroom has an improper centerline; a violation of the ADAAG and Section 604.2 of the 2010 ADA Standards, which requires the centerline of the water closet to be 16 to 18 inches from the side wall or partition, with the water closet positioned with a wall or partition to the rear and to one side. Due to the improper centerline Mr. Maurer cannot safely make use of the grab bars to transfer to and from the toilet.

ee. The lavatory in the lobby restroom lacks insulation or other protection on the exposed water supply and drain pipes; a violation of the ADAAG and Section 606.5 of the 2010 ADA Standards, which requires water supply and drain pipes under lavatories to be insulated or otherwise configured to protect against contact, with no sharp or abrasive surfaces under lavatories. The exposed pipes present Mr. Maurer with a risk of burns and injury to his legs when approaching the sink.

ff. The dispensers in the lobby restroom are mounted beyond the prescribed reach ranges; a violation of the ADAAG and Sections 308, 604.7, and 609.3 of the 2010

ADA Standards, which require dispensers and other operable parts to be mounted between 15 and 48 inches above the floor (no higher than 44 inches where the reach is over a counter 20 to 25 inches deep); Section 604.7 further requires the toilet paper dispenser to be located 7 to 9 inches in front of the water closet (measured to the centerline of the dispenser) with its outlet 15 to 48 inches above the floor, and Section 609.3 requires at least 12 inches of clear space above a grab bar. Mr. Maurer is unable to make use of these dispensers due to their improper location.

34. Each of the foregoing violations is also a violation of the ADA Standards for Accessible Design, originally published on July 26, 1991 and republished as Appendix D to 28 C.F.R. part 36 ("1991 Standards"); the "2004 ADAAG", which refers to ADA Chapter 1, ADA Chapter 2, and Chapters 3 through 10 of the Americans with Disabilities Act and the Architectural Barriers Act Accessibility Guidelines, which were issued by the Access Board on July 23, 2004 and codified as Appendices B and D to 36 C.F.R. part 1191 ("ADAAG"); and the 2010 Standards for Accessible Design ("2010 ADA Standards"), as promulgated by the U.S. Department of Justice.[12]

35. Additionally, a Justice Department regulation commonly referred to as the Reservation Rule, 28 C.F.R. § 36.302(e)(1), explains that Title III requires hotels to ensure that their reservation services include the accessibility information necessary for disabled people to enjoy the services as fully as non-disabled people. The Reservation Rule provides that under Title III, a "place of lodging" must "with respect to reservations made by any means, including by telephone, in-person, or through a third party ... [i]dentify and describe accessible features in the hotels and guest rooms offered through its reservations service in enough detail to reasonably

[12] 28 C.F.R. § 36.104.

permit individuals with disabilities to assess independently whether a given hotel or guest room meets his or her accessibility needs."[13]

36. Under the Reservation Rule, a hotel's obligations extend to "reservations made by any means, including … through a third party."[14] Thus, hotels "must provide these third-party services with information concerning the accessible features of the hotel and the accessible rooms."[15]

37. The Hotel's website does not provide accurate or sufficient information regarding the accessible features of the Property and its guestrooms. The website offers a single mobility accessible room type – "2 Double Beds, Mobility Accessible Room" – and describes it as having a "walk-in shower," "shower safety bars," a "portable bathtub seat," a "bedroom [that] is wheelchair accessible," and "closet rods at wheelchair height," without identifying whether the shower is a roll-in or transfer type shower, whether a fixed folding shower seat is provided, the clear floor space provided between the beds, or the location and height of the room's controls and storage. The website further represents that the Property provides an "Accessible Pool," an "Accessible Business Center," "Accessible Car Self-Park," "Accessible Van Self-Park," "Accessible van parking," an "Accessible Route to Pool," and that its "Venues Serving Food and Drink are Wheelchair Accessible" – representations which Mr. Maurer found to be false, as set forth in Paragraph 33.

38. This lack of accurate information violates the Reservation Rule, as it does not permit mobility impaired patrons, like Mr. Maurer, to assess independently whether the Hotel or a

---

[13] 28 C.F.R. § 36.302(e)(1)(ii).
[14] 28 C.F.R. § 36.302(e)(1).
[15] 28 C.F.R. pt. 36, app. A (Guidance on Revisions to ADA Regulation on Nondiscrimination on the Basis of Disability by Public Accommodations and Commercial Facilities, § 36.302(e) Hotel Reservations).

given guestroom meets their accessibility needs, and thus deprives them of the information with which to make an informed decision to book a stay.

39. The discriminatory violations described in Paragraph 33 may not be an exhaustive list of the ADA violations that exist at the Property, but they are the result of a preliminary inspection and include those personally encountered or observed by Mr. Maurer. Given the violations discovered and listed herein, the Plaintiff alleges, on information and belief, that there are other violations/barriers at the Property which relate to his disability. Thus, Plaintiff requires thorough inspection of the Property in order to photograph and measure the architectural barriers which exist at the Property in violation of the ADA. Once said inspection has been completed, the Plaintiff may amend this complaint in order to provide proper notice to the Defendant regarding the full scope of this action.[16]

40. Plaintiff, and other mobility impaired persons, will continue to suffer discrimination, injury, and damage without the immediate relief provided for by the ADA and requested herein.

41. Defendant has discriminated against Plaintiff, and other mobility impaired persons, by denying access to full and equal enjoyment of the goods, services, facilities, privileges, advantages and/or accommodations of its place of public accommodation or commercial facility in violation of the ADA.

---

[16]*See Doran v. 7-Eleven, Inc.*, 524 F.3d 1034, 1047 (9th Cir. 2008) (holding that once a plaintiff encounters one barrier at a site, they can sue to have all barriers that relate to their disability removed regardless of whether or not they personally encountered them); *accord Kreisler v. Second Ave. Diner Corp.*, 731 F.3d 184 (2d Cir. 2013) (per curiam) (plaintiff who used a wheelchair had standing to challenge barriers at a restaurant related to his disability that he had not yet encountered); *Steger v. Franco, Inc.*, 228 F.3d 889 (8th Cir. 2000) (plaintiff who encountered a barrier had standing to challenge other barriers at the property related to his disability).

42. Defendant continues to discriminate against Plaintiff, and other mobility impaired persons, by failing to remove architectural barriers, and communication barriers that are structural in nature.[17]

43. Defendant continues to discriminate against Plaintiff, and other mobility impaired persons, by failing to make reasonable modifications in policies, practices, or procedures, including its reservation policies, when such modifications are necessary to afford all offered goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities – including, as described above, by failing to maintain the pool lift in operable working condition, by placing pool furniture within the accessible route around the pool, and by failing to provide accurate accessibility information through its reservation services.[18]

44. Defendant continues to discriminate against Plaintiff, and other mobility impaired persons, by failing to undertake such efforts that may be necessary to ensure that no individual with a disability is excluded, denied services, segregated, or otherwise treated differently than other individuals because of the absence of auxiliary aids and services.[19]

45. Pursuant to 28 C.F.R. § 36.304(a) the Defendant shall remove all existing architectural barriers, including communication barriers that are structural in nature, where such removal is readily achievable; this duty began at the outset of the ADA for all existing facilities (regardless of age) and remains continuous and ongoing.

46. The ADA contains no "grandfather" provision. Title III's barrier-removal obligation applies to every existing place of public accommodation without regard to when it was constructed,[20] and the "grandfather" provisions often found in local building codes do not exempt

[17] 42 U.S.C. § 12182(b)(2)(A)(iv).
[18] 42 U.S.C. § 12182(b)(2)(A)(ii).
[19] 42 U.S.C. § 12182(b)(2)(A)(iii).
[20] 42 U.S.C. § 12182(b)(2)(A)(iv); 28 C.F.R. § 36.304(a).

a public accommodation from its obligations under the ADA.[21] A facility's age bears only on which standard governs a given element, not on whether the ADA applies; the sole protection the regulations afford existing elements is the limited safe harbor of 28 C.F.R. § 36.304(d)(2), which applies only to elements that already comply with the 1991 Standards.

47. If the Defendant's facility is one which was designed and constructed for first occupancy subsequent to January 26, 1993,[22] then the Defendant's facility must be readily accessible to and usable by individuals with disabilities in accordance with the 1991 Standards or, for construction commenced on or after March 15, 2012, the 2010 Standards.[23]

48. Pursuant to 28 C.F.R. § 36.402(a)(1), "any alteration" made to the Property after January 26, 1992, must have been made so as to ensure that, to the maximum extent feasible, the altered portions of the Property are readily accessible to and usable by individuals with disabilities, including individuals, like Mr. Maurer, who use wheelchairs. An alteration is deemed to be undertaken after January 26, 1992, if the physical alteration of the property begins after that date.[24] Discovery in this matter will reveal if and when such alterations have taken place at the Property, and to what corresponding technical and scoping specification the Defendant must meet/exceed to bring the Property into compliance with the ADA.

49. Upon information and belief, the Hotel was constructed in or around 1965 and has been renovated and altered on numerous occasions since January 26, 1992 – including renovations to its guestrooms and after a change in ownership in or around 2019. Each such alteration was required to be made readily accessible to and usable by individuals with disabilities to the

[21] U.S. Dep't of Justice, Civil Rights Div., *ADA Update: A Primer for Small Business* (Mar. 2011).
[22] As defined by 28 C.F.R. § 36.401(a)(2).
[23] 28 C.F.R. § 36.406(a).
[24] 28 C.F.R. § 36.402(a)(2).

maximum extent feasible,[25] and each alteration affecting an area containing a primary function – including the lobby and guestrooms – was further required to provide an accessible path of travel to the altered area, including the restrooms serving it, to the extent the cost of doing so is not disproportionate to the cost of the overall alteration.[26]

50. 28 C.F.R. § 36.304(d)(2) controls with respect to the corresponding technical and scoping specification to which each element that has not been altered must comply with or be modified to meet. Those are defined as follows:

a. Elements that have not been altered on or after March 15, 2012, and that comply with the corresponding technical and scoping specifications in the 1991 Standards, are not required to be modified to comply with the 2010 Standards.

b. Before March 15, 2012, elements that did not comply with the 1991 Standards were required to be modified to comply with either the 1991 Standards or the 2010 Standards.

c. On or after March 15, 2012, elements that do not comply with the 1991 Standards must be modified to comply with the 2010 Standards.

51. Plaintiff is not required to notify the Defendant of its violations of the ADA nor its ongoing discrimination prior to the filing of this action. To that end, Mr. Maurer has found that voicing concerns to employees and management, making phone calls, and writing letters is futile. In his experience the only way to spur action and achieve the accessibility required under the law is to file matters, like this one, and pray for the relief contained herein.

52. Plaintiff is without adequate remedy at law and is suffering irreparable harm, including injury consisting of emotional distress, mental anguish, suffering, and humiliation.

[25] 28 C.F.R. § 36.402.
[26] 28 C.F.R. § 36.403.

Considering the balance of hardships between the Plaintiff and the Defendant, a remedy in equity is warranted. The public interest would not be disserved by the issuance of a permanent injunction.

53. Pursuant to 42 U.S.C. § 12205 and 28 C.F.R. § 36.505, Plaintiff is entitled to recovery of attorney's fees, costs, and litigation expenses from the Defendant.

54. Pursuant to 42 U.S.C. § 12188(a)(2), this Court is provided with authority to grant Plaintiff injunctive relief, including an order to require the Defendant to alter the Property and make such readily accessible to and usable by the Plaintiff and all other persons with disabilities as defined by the ADA.

**WHEREFORE**, Plaintiff respectfully demands:

a. The Court issue a Declaratory Judgment determining that the Defendant is in violation of Title III of the ADA.

b. Injunctive relief against the Defendant including an order to (1) cure all ADA violations existing at the Property listed herein – and those later found through discovery – within the next six months; (2) make the Property accessible to and usable by individuals with disabilities; (3) require the Defendant to make reasonable modifications in policies, practices, or procedures, to ensure that no individual with a disability is excluded, denied services, segregated, or otherwise treated differently than other individuals because of the absence of auxiliary aids and services; and (4) require the Defendant to bring its reservation services, including those offered through third parties, into compliance with 28 C.F.R. § 36.302(e).

c. An Order requiring the Defendant to cease its discriminatory practices and to maintain the requisite accessible features at the Property – as required by the ADA.

d. An award of attorney's fees, costs, and litigation expenses (including expert fees and costs) pursuant to 42 U.S.C. § 12205.

e. Such other relief as the Court deems just and proper and is allowable under Title III of the ADA.

**COUNT II**
**Violation of New Jersey Law Against Discrimination, N.J.S.A. 10:5-1 *et seq.***

55. Plaintiff realleges and incorporates, by reference, all of the allegations contained in all of the preceding paragraphs.

56. The Property is a place of public accommodation as defined by N.J.S.A. 10:5-5.

57. New Jersey law provides that all persons shall have the opportunity to obtain all the accommodations, advantages, facilities, and privileges of any public place of accommodation without discrimination on the basis of disability. This opportunity is recognized and declared to be a civil right.[27]

58. As set forth above, the Defendant has violated the LAD by denying Mr. Maurer, and all other mobility impaired persons, the full and equal enjoyment of the goods, facilities, services, and accommodations available at the Property.

59. As a result of the aforementioned discrimination through repeated exposure to architectural barriers and other harmful conditions, Mr. Maurer has sustained injury through the Defendant's actions – either intentionally or negligently – in the form of emotional distress, mental anguish, dignitary harm, and humiliation; in violation of the LAD.

**WHEREFORE**, Plaintiff respectfully demands:

a. That this Court assume jurisdiction.

---

[27]N.J.S.A. 10:5-4.

b. The Court issue a Declaratory Judgment determining that the Defendant is in violation of the LAD.

c. An injunction ordering the Defendant to immediately comply with the LAD by removing all architectural barriers listed herein or later found through discovery.

d. A monetary award consisting of the individual Plaintiff's damages – to the maximum extent permitted – attorney's fees, and litigation expenses, including expert fees and costs.

e. An order requiring the Defendant to cease its discriminatory practices and to maintain the requisite accessible features at the Property – as required by the LAD.

f. Other relief that this Court deems just and proper and is allowable under the LAD.

Respectfully submitted on this 28th day of October 2026,

*/s/ Jon G. Shadinger Jr.*
Jon G. Shadinger Jr., Esq.
Shadinger Law, LLC
2220 N. East Avenue
Vineland, NJ 08360
(609) 319-5399
js@shadingerlaw.com
*Attorney for Plaintiff, Dennis Maurer*